AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT
8/6/24

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Case No. 3:24-mj-515

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the **Southern** District of **Ohio**, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841(a)(1) | possession with intent to distribute/distribution of controlled substances |
| 21 USC s. 846 | conspiracy |

The application is based on these facts:

See Attached Affidavit of Robert Buzzard

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Robert Buzzard*
Applicant's Signature

Robert Buzzard, SA of the FBI
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by reliable electronic means.

Date: August 6, 2024

Caroline H. Gentry
United States Magistrate Judge

City and state: Dayton, Ohio

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Robert Buzzard, hereby duly sworn, declare and state:

## INTRODUCTION

1. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), assigned to the Cincinnati Division, Dayton, Ohio Resident Agency. I therefore am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878. Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510.

2. I have served as an FBI SA since January 2002. I am currently assigned to the Cincinnati Division, Dayton Resident Agency and serve on the FBI's Southern Ohio Safe Streets Task Force (SOSSTF). Since 2002, I have participated in investigations involving narcotics trafficking and have received specialized training on the subject of narcotics trafficking and money laundering from the FBI. I have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. Based on my training and experience – including my participation in the investigations referenced above – as well as discussions and interactions with other experienced FBI SA's, Task Force Officers ("TFO"), and narcotics investigators, I am familiar with the manner in which drug traffickers and their organizations operate within the United States. Based on my aforementioned training and experience, I am familiar with the modus operandi of persons involved in the illicit distribution of controlled substances and as a result, knows the following:

   a. It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and beeper/pager services by using other person's names in order to avoid detection by law enforcement officials.

b. It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

c. That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

d. It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

e. It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

f. It is common practice that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them.

g. It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h. That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i. When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

j. Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

k. It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their

      associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

l.      Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones.

m.      Drug traffickers commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n.      Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

o.      The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

p.      Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

q.      Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

r. I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away.

## PURPOSE OF AFFIDAVIT

3. I make this affidavit in support of applications for search warrants for the following residence and vehicles – namely:

a. ███████████████████████████████████████, including any outbuildings, garages, basements or sheds located on its curtilage (hereinafter referred to as: "███████"). ███████ is described more fully in Attachment A-1, which is incorporated herein by reference;

b. 2018 Mercedes Sport Utility Vehicle, black in color, Ohio license plate ███████, Vehicle Identification Number (VIN) ███████ (hereinafter "**Vehicle 1**"). **Vehicle 1** is described more fully in Attachment A-2, which is incorporated herein by reference;

c. 2020 Range Rover Land Rover Sport Utility Vehicle, white in color, Ohio license plate number ███████, Vehicle Identification Number (VIN) ███████ (hereinafter **"Vehicle 2"**). **Vehicle 2** is described more fully in Attachment A-3, which is incorporated herein by reference.

4. As detailed more fully below, I submit that there is probable cause to believe that

evidence of a crime as well as contraband, fruits of a crime or other items illegally possessed in relation to the following offenses exist and can be found inside the ▓▓▓▓▓▓, **Vehicle 1 and Vehicle 2**– namely:

    a.    Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 841, and

    b.    Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 846.

5.    A list of specific items to be seized from the premise and vehicles described above is attached hereto as Attachment B, and Attachment B is incorporated herein by reference. Based on my training and experience as well as the facts contained in the affidavit, I believe that there is probable cause to believe that the items listed in Attachment B will be found at/in the premise and vehicles described above. I have not included every detail of the investigation, but only information necessary to establish probable cause that evidence associated with above-described drug trafficking offenses is located at the ▓▓▓▓▓▓, and inside **Vehicle 1** and **Vehicle 2**.

## PROBABLE CAUSE

6.    This affidavit details an investigation into the drug trafficking activities of ▓▓▓▓▓▓▓▓ (hereinafter ▓▓▓▓▓▓) and his associates in the Greater Dayton, Ohio area from May 2024 to the present day. The investigative team is comprised of local, state, and federal law enforcement officials from the Warren County Ohio Drug Task Force, and FBI Dayton. As detailed below, the investigative team utilized confidential sources and undercover law enforcement officials to conduct controlled purchases of methamphetamine and fentanyl directly from ▓▓▓▓▓▓ over the past three months. Physical surveillance by members of the investigative team in an around the controlled drug buys identified a drug stash

house utilized by ▇▇▇▇ (▇▇▇▇▇▇) as well as vehicles he uses to transport narcotics and drug sale proceeds (**Vehicle 1** and **Vehicle 2**).

7. In or around May 2024, members of the Warren County Ohio Drug Task Force received information from a Confidential Source, hereinafter referred to as CS1. CS1 identified ▇▇▇▇ as a large-scale methamphetamine trafficker operating in the Warren County/Montgomery County, Ohio areas. CS1 identified ▇▇▇▇ residence as the ▇▇▇▇. I am familiar with ▇▇▇▇ and know he was the subject of two prior FBI drug investigations prosecuted in the Southern District of Ohio. Specifically, ▇▇▇▇ was convicted in case number ▇▇▇▇ for maintaining a drug premises, and in case number ▇▇▇▇ for distribution of 50 grams or more of Methamphetamine/Carfentanil.

8. During the second week of May 2024, task force members utilized CS1 to arrange a covert/undercover purchase of fentanyl from ▇▇▇▇ in Warren County, Ohio. CS1 placed a pre-buy cellular telephone call to ▇▇▇▇ and arranged for the purchase of an amount of fentanyl. ▇▇▇▇ directed CS1 to his residence, the ▇▇▇▇. Task Force Officer (TFO) Bob Marchiny, working in an undercover capacity, accompanied CS1 during the drug deal. TFO Marchiny observed CS1 and ▇▇▇▇ meet outside the ▇▇▇▇ briefly before they both entered the ▇▇▇▇ to complete the drug transaction. Afterward, CS1 returned to TFO Marchiny's vehicle with the suspected fentanyl that he purchased from ▇▇▇▇ using pre-recorded law enforcement buy funds. The suspected fentanyl was seized as evidence and submitted to the Miami Valley Regional Crime Lab for analysis. Lab results showed the substance tested positive for the presence of fentanyl (Schedule II) and xylazine (Schedule III).

9. Based on my training and experience, as well as the events described above, I

believe the fentanyl ▇▇▇ sold CS1 was being stored inside and retrieved from the ▇▇▇. I also believe the pre-recorded law enforcement buy funds used to purchase the fentanyl were stored and kept inside the ▇▇▇.

10. During the first week of June 2024, task force members arranged a second purchase of methamphetamine plus an amount of fentanyl from ▇▇▇. The meet was arranged by CS1 through direct cellular telephone communication with ▇▇▇. Prior to the meet, task force members conducted surveillance at the ▇▇▇ and noted **Vehicle 1** and **Vehicle 2** parked there. ▇▇▇ directed CS1 to a publicly accessible area in Lebanon, Ohio to complete the transaction. TFO Dan Schweitzer, working in an undercover capacity, accompanied CS1 to the meet location. ▇▇▇ arrived at the meet location driving **Vehicle 1**. ▇▇▇ provided CS1 with ounce quantities of methamphetamine and fentanyl in exchange for pre-recorded law enforcement buy funds. The suspected methamphetamine and fentanyl were submitted to the Miami Valley Regional Crime Laboratory for analysis. Lab results for the suspected fentanyl tested positive for the presence of fentanyl (Schedule II) and xylazine (Schedule III), and the methamphetamine tested positive for methamphetamine (Schedule II).

11. Based on my training and experience, as well as the events described above, I believe the fentanyl and methamphetamine ▇▇▇ sold CS1 were being stored inside and retrieved from the ▇▇▇. I believe **Vehicle 1** was utilized during the drug transaction to transport and store both narcotics and drug proceeds.

12. Since May 2024, task force members have conducted surveillance at the ▇▇▇ on multiple occasions and consistently observed **Vehicle 1** and **Vehicle 2** parked there.

13. During the last week of June 2024, task force members arranged a third purchase of narcotics from ▉▉▉▉▉. TFO Schweitzer, working in an undercover capacity, arranged the drug transaction directly with ▉▉▉▉▉ via cell phone. Ultimately, TFO Schweitzer and ▉▉▉▉▉ agreed to meet in Franklin, Ohio. Pre-buy surveillance was established at the ▉▉▉▉▉ and both **Vehicle 1** and **Vehicle 2** were parked there. ▉▉▉▉▉ left the ▉▉▉▉▉ driving **Vehicle 2** and arrived at the meet location. ▉▉▉▉▉ provided TFO Schweitzer an ounce of fentanyl in exchange for pre-recorded law enforcement buy funds. The fentanyl was submitted to the Miami Valley Regional Crime Lab for testing. Lab results identified the substance as para-Fluorofentanyl (Schedule I) with a net weight of 26 grams.

14. Based on my training and experience, as well as the events described above, I believe the fentanyl ▉▉▉▉▉ sold TFO Schweitzer was being stored inside and retrieved from the ▉▉▉▉▉. I believe **Vehicle 2** was utilized during the drug transaction to transport and store both narcotics and drug proceeds.

15. During the first week of July 2024, task force members arranged a fourth purchase of narcotics from ▉▉▉▉▉. TFO Schweitzer, working in an undercover capacity, arranged the drug transaction directly with ▉▉▉▉▉ via cell phone. Ultimately, TFO Schweitzer and ▉▉▉▉▉ agreed to meet at the ▉▉▉▉▉. Pre-buy surveillance was established at the ▉▉▉▉▉ and both **Vehicle 1** and **Vehicle 2** were parked there. When TFO Schweitzer arrived, ▉▉▉▉▉ exited the ▉▉▉▉▉ and entered TFO Schweitzer's vehicle. ▉▉▉▉▉ provided TFO Schweitzer with two ounces of fentanyl in exchange for pre-recorded law enforcement buy funds. Following the transaction, ▉▉▉▉▉ returned to the ▉▉▉▉▉. The fentanyl was submitted to the Miami Valley Regional Crime Lab for testing. Lab results identified the substance as fentanyl (Schedule II) with a net

weight of 55 grams.

16. Based on my training and experience, as well as the events described above, I believe the fentanyl ▓▓▓▓ sold TFO Schweitzer was being stored inside and retrieved from the ▓▓▓▓. I also believe the pre-recorded law enforcement buy funds used to purchase the fentanyl were stored and kept inside the ▓▓▓▓

17. During the second week of July 2024, task force members arranged a fifth purchase of narcotics from ▓▓▓▓. TFO Schweitzer, working in an undercover capacity, arranged the drug transaction directly with ▓▓▓▓ via cell phone. ▓▓▓▓ agreed to sell TFO Schweitzer one ounce of fentanyl and one pound of methamphetamine. ▓▓▓▓ advised he was in possession of the fentanyl but needed to go to Dayton to get the ice (methamphetamine). Prior to the transaction, task force members noted both **Vehicle 1** and **Vehicle 2** were parked at the ▓▓▓▓. Task force members watched as ▓▓▓▓ exited the ▓▓▓▓ and entered **Vehicle 2.** ▓▓▓▓ proceeded to drive **Vehicle 2** to Dayton, Ohio where he met up with an unknown individual and acquired the methamphetamine. ▓▓▓▓ then traveled back to Lebanon, Ohio and met TFO Schweitzer in a publicly accessible area. ▓▓▓▓ provided TFO Schweitzer one ounce of fentanyl and one pound of methamphetamine in exchange for pre-recorded law enforcement buy funds. Following the transaction, ▓▓▓▓ traveled back toward Dayton. The fentanyl and methamphetamine were submitted to the Miami Valley Regional Crime Lab for testing. Lab results identified the substances as fentanyl (Schedule II) with a net weight of 27 grams, and methamphetamine (Schedule II) with a net weight of 443 grams.

18. On or about July 18, 2024, task force members arranged a sixth purchase of

narcotics from ▆▆▆▆. TFO Schweitzer, working in an undercover capacity, arranged the drug transaction directly with ▆▆▆▆ via cell phone. ▆▆▆▆ agreed to sell TFO Schweitzer four ounces of fentanyl. Prior to the transaction, task force members noted both **Vehicle 1** and **Vehicle 2** were parked at the ▆▆▆▆. Task force members watched as ▆▆▆▆ exited the ▆▆▆▆ and entered **Vehicle 2.** ▆▆▆▆ indicated to TFO Schweitzer he needed to go to Dayton to pick up the narcotics. ▆▆▆▆ and TFO Schweitzer ultimately agreed to meet at the Dayton Mall in Miami Township, Ohio. Upon arrival, ▆▆▆▆ provided TFO Schweitzer four ounces of fentanyl in exchange for pre-recorded law enforcement buy funds. The fentanyl was submitted to the Miami Valley Regional Crime Lab for testing. Lab results identified the substance as fentanyl (Schedule II) with a net weight of 111 grams.

19. On or about July 31, 2024, task force members arranged a seventh purchase of narcotics from ▆▆▆▆. TFO Schweitzer, working in an undercover capacity, arranged the drug transaction directly with ▆▆▆▆ via cell phone. ▆▆▆▆ agreed to sell TFO Schweitzer four ounces of fentanyl. Prior to the transaction, task force members noted **Vehicle 2** and a blue Kia Forte sedan, bearing Illinois license plate ▆▆▆▆ were parked at the ▆▆▆▆. A registration check on the Kia Forte showed it was a rental car. Task force members watched as ▆▆▆▆ exited the ▆▆▆▆ and entered the rental car. ▆▆▆▆ drove to meet TFO Schweitzer in a publicly accessible parking lot in Lebanon, Ohio. ▆▆▆▆ provided TFO Schweitzer four ounces of fentanyl in exchange for pre-recorded law enforcement buy funds. The fentanyl was submitted to the Miami Valley Regional Crime Lab for testing. Lab results are pending.

20. Based on my training and experience, as well as the events described above, I

believe the fentanyl ▮▮▮ sold TFO Schweitzer was being stored inside and retrieved from the ▮▮▮. I believe the rental car was utilized during the drug transaction to transport and store both narcotics and drug proceeds.

21. Your affiant researched Ohio Bureau of Motor Vehicle registrations for **Vehicle 1** and **Vehicle 2**. Both vehicles are registered in the name of ▮▮▮ live-in girlfriend ▮▮▮ address listed on the vehicle registrations is the ▮▮▮.

### **CONCLUSION**

22. Based on the facts set forth in the Affidavit, I believe there is probable cause that evidence associated with the above listed drug trafficking offenses are located within the ▮▮▮ and surrounding curtilage, and **Vehicles 1 and 2**.

*Robert Buzzard*
Robert Buzzard
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me By telephone on this
__6th__ day of August 2024.

Caroline H. Gentry
United States Magistrate Judge

ATTACHMENT A-1

▮▮▮▮▮▮▮ The place to be searched is ▮▮▮▮▮▮▮ ▮▮ including any outbuildings, garages, or sheds located on its curtilage. ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ is contained within a two-story structure that also houses Unit A. The structure is constructed of tan/yellow siding with white trim. The numbers ▮▮ are affixed on the front of the structure and the letter "B" is affixed next to the entrance door. ▮▮▮▮▮▮▮▮▮▮▮ is further depicted in the following photograph.



ATTACHMENT A-2

**Vehicle 1:** 2018 Mercedes Sport Utility Vehicle, black in color, Ohio license plate ▇▇▇▇, Vehicle Identification Number (VIN) ▇▇▇▇▇▇▇▇▇▇▇▇▇.



## ATTACHMENT A-3

**Vehicle 2:** 2020 Range Rover Land Rover Sport Utility Vehicle, white in color, Ohio license plate number ▮▮▮▮, Vehicle Identification Number (VIN) ▮▮▮▮▮▮▮▮.



## ATTACHMENT B

## PROPERTY TO BE SEIZED

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. §§ 846 and 841(a)(1) including, but not limited to:

A. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E. Electronic equipment such as surveillance video and related equipment, pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F. United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H. Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

I. Illegal drugs, including but not limited to methamphetamine and fentanyl and other materials, paraphernalia and/or equipment and tools used in the drug trade.

J. Firearms and ammunition.